**L & B OIL COMPANY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 80–2003.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 15, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Thomas W. Reavley, Austin, Tex., for petitioner.

Andrea C. Wolfman, Washington, D.C., for respondent.

Before CLARK, GARZA and SAM D. JOHNSON, Circuit Judges.

CLARK, Circuit Judge:

L & B Oil Company has petitioned this court for review of an order of the Federal Energy Regulatory Commission (FERC) reversing a decision by the Colorado Oil and Gas Conservation Commission that L & B was entitled to a favorable pricing category provided for by the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.* (Supp. III 1979). L & B challenges FERC's jurisdiction as well as its decision. We approve FERC's assertion of jurisdiction but reverse its order on the merits.

### I.

In 1971, Webb Resources, a company unaffiliated with L & B, drilled an exploratory well to a depth of 7,555 feet on land leased from the State of Colorado. Within two weeks of the commencement of the drilling, the well bore was plugged with cement and the venture was abandoned as a dry hole. Webb's lease expired sometime thereafter. In 1978, L & B obtained from the state a lease on the land previously leased to Webb.

L & B commenced its State No. 1 Well in 1979 by drilling out the thirty-foot cement surface plug left by Webb. The L & B well followed the Webb well bore to a depth of 479 feet, whereupon the drill bit was devi-

ated from the original hole and the well was drilled to a depth of 7,606 feet. The well now produces gas from formations between 7,402 and 7,463 feet below the surface.

The Natural Gas Policy Act (NGPA) permits state regulatory agencies to determine whether certain production qualifies for the price category established by section 103 of the NGPA.[1] Under this authority, the Colorado Oil and Gas Conservation Commission determined that L & B's State No. 1 Well was a "new, onshore production well" entitled to prices established under the NGPA.[2] The NGPA also provides a method by which a state agency determination may be reviewed and reversed by FERC and the method FERC must follow in giving notice of a decision to review and reverse.[3] L & B argues that FERC's notice of its preliminary finding was untimely, thus depriving it of jurisdiction to reverse the Colorado agency, and that FERC's determination on the merits was incorrect.

## II.

Before FERC may exercise its authority to review and reverse another agency's determination that a well is entitled to "new, onshore production" status under the NGPA, FERC must comply with certain requirements which the parties concede to be jurisdictional. The particular requirement of concern in this case is that FERC make a preliminary finding to reverse the

state or federal agency and so notify the agency and parties within 45 days of FERC's receipt of notice of the state or federal agency's determination.

Notice of the Colorado agency's determination was received by FERC on February 5, 1980, and assigned Docket No. GP 80–80. On March 21, 1980, 45 days later, FERC issued a Notice of Preliminary Finding that the Colorado agency's determination should be reversed, and publicly posted it under Docket No. GP 80–3 in its Office of Public Information in Washington, D.C. The Preliminary Finding was published in the Federal Register on March 28, 1980. 45 Fed. Reg. 20530. On March 31, 1980, FERC posted an erratum notice correcting the docket number to GP 80–80. On April 1, 1980, FERC mailed copies of the Preliminary Finding and the erratum notice to L & B and the Colorado agency.

L & B submitted written comments to FERC staff on April 22 and June 18, 1980, and requested an informal conference with FERC staff. An informal conference was held at FERC's offices on June 19, 1980, at which time L & B made the same arguments presented in the instant petition. L & B filed supplemental comments on July 7, 1980. On July 18, 1980, FERC issued its Final Finding on Well Category Determination reversing the Colorado agency's determination.

■ L & B alleges that by posting the notice in its Washington office under an

1. NGPA § 503(a), 15 U.S.C. § 3413(a).

2. NGPA § 103(a), 15 U.S.C. § 3313(a), provides that:

> In the case of natural gas determined in accordance with section 3413 of this title to be produced from any new, onshore production well, the maximum lawful price computed under subsection (b) of this section shall apply to any first sale of such natural gas delivered during any month.

3. NGPA § 503(b), 15 U.S.C. § 3413(b), provides, in pertinent part, as follows:

> (b) Commission review.—
> (1) Authority to review and reverse.—The Commission shall reverse any final State or Federal agency determination described in subsection (a) of this section if—

> (A) it makes a finding that such determination is not supported by substantial evidence in the record upon which such determination was made; and
> (B) such preliminary finding and notice thereof under paragraph (3) is made within 45 days after the date on which the Commission received notice of such determination under subsection (a)(2) of this section and the final such finding is made within 120 days after the date of the preliminary finding.
>
> \*    \*    \*    \*    \*    \*
>
> (3) Notice.—The Commission shall provide notice of any proposed finding under this subsection to the State or Federal agency which made such determination and those parties identified in the notice to the Commission of such determination.

incorrect docket number, the Commission provided notice to no one within the 45-day period. FERC responds that the proof does not show that L & B or anyone else attempted to avail itself of the notice as posted. In the absence of such proof, there is nothing to contradict FERC's assertion that if anyone had attempted to discover whether a preliminary decision about the status of State Well No. 1 had been posted within the required time, they would have found the notice in question. FERC mailed copies of the posted notice to the Colorado agency and L & B nearly two weeks later. No court has decided whether the public posting of a preliminary determination complies with the NGPA.[4] We hold that FERC's posting practice met the absolute minimum statutory notice requirement of the NGPA.

NGPA's section 503(b), 15 U.S.C. § 3413(b), requires only "notice" to the state agency and parties within 45 days. The statutory language which we are required to interpret makes no particular form or class of notice mandatory. By construing that provision to require actual notice or personal notice by mail within 45 days, we would be adding to the words of the statute. Congress chose to leave to FERC the determination of an appropriate method of giving notice to the agency and parties within 45 days. FERC's public posting of

its preliminary decision at its Washington office within 45 days, coupled with a subsequent mailing of copies to the parties, complied with the literal requirements of the statute. While this makes the 45-day notice requirement a device that does little more than compel FERC to complete its review of state agency determinations within the specified period, we cannot say it fails to comply with the statute.[5]

FERC's regulations do not add to the statute's literal notice requirements with respect to the 45-day period.[6] "[W]ritten notice" within the 45-day period is required. However, the portion of the regulation requiring that "[c]opies of the written notice will be sent" to the state agency and parties is worded in the future tense. FERC's construction of its regulation as requiring written notice by posting within the 45-day period to be followed by sending copies to the parties is a reasonable one. FERC complied by posting written notice of its preliminary determination within the 45-day period, by subsequently publishing that notice in the Federal Register, and by later mailing copies to the Colorado agency and L & B.

Despite the fact that FERC's notification methods could have been more meaningful with minimum additional administrative burden to it, we must observe that those procedures did not in any way prejudice L

---

4. The Tenth Circuit was presented with, but declined to resolve, the issue in a recent decision. *True Oil Co. v. Federal Energy Regulatory Comm'n*, 663 F.2d 75 (10th Cir. 1981). Judge Breitenstein's discussion of the issue went thus:

> True says that the 45-day requirement is jurisdictional. The Commission says that it satisfied the requirement by posting the notice and mailing the letter. We seriously doubt the sufficiency of a notice posted in Washington and mailed to a Wyoming company. In the light of the record presented and the lack of definition of "notice" in the statute or legislative history, we decline to decide the point and turn to the merits. *Id.* at 76.

5. The Conference Report supports the proposition that the prescribed time periods were designed to compel prompt Commission action. *See* Jt. Explanatory Statement of the Committee on Conference, P.L. 95–621, 95th Cong., 2d

Sess. 117–118, *reprinted in* [1978] U.S.Code Cong. & Ad.News 8800, 9034–35.

6. 18 C.F.R. § 275.202(a)(2) (1980) provides:

> (a) Review by Commission. Except as provided in paragraphs (b), (c) and (d) of this section, a determination submitted to the Commission by a jurisdictional agency shall become final 45 days after the date on which the Commission received notice of the determination, unless within the 45-day period, the Commission:
>
> \*　\*　\*　\*　\*　\*
>
> (2) Issues written notice of such preliminary finding, including the reasons for the preliminary finding. Copies of the written notice will be sent to the jurisdictional agency which made the determination, to the persons identified in the notice under § 274.104 of such determination, and to any persons who have filed a protest.

& B. The notice was intended to do no more than inform L & B that the Colorado agency's determination was being subjected to serious FERC review. It was not notice that required L & B immediately to change its pricing structure or otherwise alter its primary conduct.[7] Nor did the delay in the date of receipt of actual notice cause loss to L & B. L & B does not contend that it was unable to present its case before FERC reached a final determination. On the contrary, pursuant to FERC regulations,[8] L & B filed written comments and informally conferred with FERC staff members before FERC's decision was made. Hence, the notification did not impair L & B's right to be heard.[9]

## III.

■ Finding that the notice given was sufficient to confer jurisdiction to decide the merits, we determine that FERC erred in upsetting the Colorado agency's determination that L & B State No. 1 Well was a new, onshore production well. FERC's standard of reviewing the agency's determination is whether it is supported by substantial evidence. NGPA § 503(b)(1), 15 U.S.C. § 3413(b)(1). The NGPA explicitly requires this court to apply the same standard. *Id.*, § 503(b)(4)(B), 15 U.S.C. § 3413(b)(4)(B). By mandating identical review standards, the statute minimizes the degree of deference we are to pay FERC's

intervening decision. The effect is to require us to determine for ourselves whether the Colorado agency's ruling was supported by substantial evidence.

In reversing the Colorado agency's determination, FERC found that agency to be incorrect as a matter of law. FERC argues that we should defer to its interpretation of the NGPA. Since we find that FERC's legal interpretation is inconsistent with the NGPA's clear language and purpose, we need not consider the degree to which this court must defer to an agency's reasonable interpretation of an ambiguous statute within its administrative ambit. *See Federal Election Commission v. Democratic Senatorial Campaign Committee,* —— U.S. ——, ——, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Mid-Louisiana Gas Co. v. Federal Energy Regulatory Commission,* 664 F.2d 530, 534 (5th Cir. 1981).

We first consider FERC's argument that the Colorado agency's determination is erroneous under the correct interpretation of the NGPA and then turn to the issue of whether the Colorado agency's determination was supported by substantial evidence.

### A. *"New, Onshore Production Well"* under the NGPA

In analyzing the meaning of "new, onshore production well," we turn first, as in

---

7. *See Ecee, Inc. v. Federal Energy Regulatory Comm'n,* 645 F.2d 339, 345 (5th Cir. 1981) ("Once [the state or federal] agency issues its finding that the gas qualifies for a certain maximum lawful price, the seller may continue to collect, subject to refund, the price specified in that determination pending FERC review.").

8. 18 C.F.R. § 275.201(f) provides as follows:
    Procedures following notice of preliminary finding. Any state or federal agency or any person may, within 30 days after issuance of the preliminary finding, submit written comments and request an informal conference with the Commission staff. Any jurisdictional agency, any state agency and any person receiving notice under paragraph (a)(2) of this section, may request an informal conference with the Commission staff. All timely requests for conferences will be granted. Notice of, and permission to attend, such conferences will be given to persons identi-

fied in paragraph (a)(2) of this section, and to state or federal agencies or persons who submitted comments under this paragraph.

9. L & B argues that FERC violated its own rule of practice, 18 C.F.R. § 1.13(b), by publicly issuing its preliminary finding without first serving L & B or making a public interest determination to justify the public disclosure. In addition, L & B argues that FERC's method of notification violated its regulation making service of orders effective upon mailing, 18 C.F.R. § 1.17(d). We will not pass upon the adequacy of FERC's compliance with its rules of procedure since we are doubtful of their applicability and perceive no injustice or prejudice caused by the alleged non-compliance. *See American Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970).

all cases involving statutory construction, to the language of the statute itself. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976); *Ecee, Inc. v. Federal Energy Regulatory Commission*, 611 F.2d 554, 561 (5th Cir. 1980).[10] The portion of the statute of concern defines a "new, onshore production well" as "any new well . . . the surface drilling of which began on or after February 19, 1977." NGPA § 103(c)(1), 15 U.S.C. § 3313(c)(1).[11] The issue is whether, as a matter of law, L & B's State No. 1 Well cannot be a "new, onshore production well" within the plain meaning of section 103.

FERC's position on the issue is simple. According to FERC's argument before this court and in its previous pronouncements,[12] the date on which surface drilling begins is the date of "spudding in." Professors Williams and Meyers define "spudding in" as the initial boring of the hole, to a depth of approximately 100 feet, in drilling an oil or gas well. H. Williams & C. Meyers, *Manual of Oil and Gas Terms* 564 (4th ed. 1976). FERC contends that the surface drilling of L & B's State No. 1 Well took place in 1971 when Webb spudded in the well, and that State No. 1 Well could not possibly be a "new, onshore production well" because this spudding in can only occur once. FERC's bright-line rule equating spudding in with surface drilling and limiting this initiating event to a single time in any well bore ever drilled is too strict. While undoubtedly appropriate in certain factual contexts, it would lead to a result in this case entirely inconsistent with the statutory language.

The surface drilling of L & B's State No. 1 Well commenced in 1979 when L & B drilled out the thirty-foot cement surface plug left in the dry hole abandoned by Webb in 1971. L & B was not merely reactivating Webb's dry hole or deepening a previously spudded well. We pretermit any guess at whether in those situations the prior spudding in may constitute the initiation of surface drilling. Different circumstances obtain in the case before us. A dry hole, such as the one abandoned by Webb, is not a well. *See Nafco Oil & Gas, Inc. v. Tartan Resources Corp.*, 522 S.W.2d 703, 707 (Tex.Civ.App.1975); H. Williams & C. Meyers, *supra* at 176.[13] Thus, when L & B drilled through the cement plug, it was initiating the surface drilling of a new well. The fact that it followed the uncollapsed bore of the dry hole for a few hundred feet before deviating adds no more to FERC's

**10.** *See also* Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 535 (1947) ("Though we may not end with the words in construing a disputed statute, one certainly begins there.").

**11.** The statutory definition, in its entirety, is as follows:
Definition of new, onshore production well. —For purposes of this section, the term "new, onshore production well" means any new well (other than a well located on the Outer Continental Shelf)—
(1) the surface drilling of which began on or after February 19, 1977;
(2) which satisfies applicable Federal or State well-spacing requirements, if any; and
(3) which is not within a proration unit—
(A) which was in existence at the time the surface drilling of such well began;
(B) which was applicable to the reservoir from which such natural gas is produced; and
(C) which applied to a well (i) which produced natural gas in commercial quantities or (ii) the surface drilling of which was begun before February 19, 1977, and which was thereafter capable of producing natural gas in commercial quantities.
NGPA § 103(c), 15 U.S.C. § 3313(c). The statutory definition of "new well," NGPA § 2(3)(A), 15 U.S.C. § 3301(3)(A), is identical in wording to NGPA § 103(c)(1), 15 U.S.C. § 3313(c)(1). Thus, for our purposes, the "new well" and "new, onshore production well" definitions are redundant.

**12.** Interim Regulations Implementing the Natural Gas Policy Act of 1978, 43 Fed.Reg. 56,448, 56,467 (effective Dec. 1, 1978) (this release uses the expression spudding, though the rule it spawned, 18 C.F.R. § 271.303, does not add to the statutory language at issue here); Final Order on Well Category Determination, FERC Docket No. GP 79–72 (Nov. 20, 1979); Final Order on Well Category Determination, FERC Docket No. GP 79–18 (Sept. 14, 1979).

**13.** The NGPA's rather circular definition of "well" neither supports nor contradicts this understanding. *See* NGPA § 2(2), 15 U.S.C. § 3301(2).

position than if L & B had drilled through the cement plug, but used none of the old well bore. Because L & B's drilling venture took place in 1979, State No. 1 Well could qualify for pricing under NGPA § 103 as a new, onshore production well.

A more thorough factual analysis shows this interpretation of the statute is consonant with the principles embodied in the NGPA. President Carter, in signing into law several of the bills (including the NGPA) comprising his National Energy Plan, noted that one of the three principles encompassed by those bills was to "provide adequate incentives . . . to encourage additional production of available expendable energy supplies in our own country." J. Carter, II *Pub. Papers* 1978–79 (1978). The NGPA's passage was prompted by a serious natural gas shortage, and provided for various classes of economic incentives for new exploration and production. *See* Note, *Legislative History of the Natural Gas Policy Act: Title I*, 59 Texas L.Rev. 101, 110–13 (1980). As we have previously noted, the NGPA "adopted an incentive-based approach to rate-setting for gas production, providing substantially higher prices for 'new' gas than was currently available." *Pennzoil Co. v. Federal Energy Regulatory Commission*, 645 F.2d 360, 367 (5th Cir. 1981).

The section at issue in this case is one of the many sections of the NGPA that effectuates the Act's purpose by providing specific price incentives for new production. That purpose would be thwarted by FERC's interpretation of "new, onshore production well." Almost the entirety of normal exploration costs were incurred and all of the production efforts were made by L & B in 1979. It discovered and produced gas where there was none before. Such an enterprise is of the sort the NGPA sought to encourage through price incentives. To hold, as a matter of law, that the L & B well could not qualify as a "new, onshore production well" because it made minimal use of a dry hole bore would do violence to one of the obvious purposes of the Act.

The foregoing discussion should not be interpreted as implying that the spudding in date is irrelevant to the determination of what is a "new, onshore production well." On the contrary, we merely hold that in certain circumstances a state agency can correctly grant "new, onshore production well" status to a well that was not literally spudded in on or after February 19, 1977.

### B. *The Colorado Agency's Determination*

The NGPA requires us to reverse FERC's decision if we find that the Colorado agency's determination is supported by substantial evidence. NGPA § 503(b)(4)(B), 15 U.S.C. § 3413(b)(4)(B). Our standard of review is identical to that prescribed for FERC review of the state agency. *Id.*, § 503(b)(1)(A), 15 U.S.C. § 3413(b)(1)(A). The degree of deference to be granted a state agency determination was specifically addressed in the NGPA's legislative history:

> The conferees intend that the Commission's authority to review State or Federal agency determinations shall be limited to determining the narrow question of whether or not the agency determination is supported by substantial evidence. The conferees have followed the traditional definition of substantial evidence review; that is, there is no intention to allow the Commission to "second guess" the agency by independently weighing the evidence and reversing the agency's determination as if the initial responsibility to make the determination were placed within the Commission.

Joint Explanatory Statement of the Committee on Conference, P.L. 95–621, 95th Cong., 2d Sess. 118, *reprinted in* [1978] U.S. Code Cong. & Ad.News 8800, 9035. FERC's quarrel with the Colorado agency was over a matter of statutory interpretation, and not the evidence itself. We have evaluated FERC's argument and rejected its niggardly reading of the statute. Thus, we are left to determine whether the Colorado agency's determination was supported by substantial evidence. We hold that it was.

Prior to 1979, L & B was in no way involved with the old Webb dry hole. During that year, L & B committed its resources toward drilling a productive well. L & B was successful, not because it relied on a portion of the Webb dry hole bore, but because of its dedication to its own 1979 venture. We conclude that these factors are substantial evidence to support the Colorado agency's determination that L & B State No. 1 Well is a "new, onshore production well."

#### IV.

FERC correctly held that it had jurisdiction to reverse the Colorado determination. However, the Colorado agency's determination was supported by substantial evidence. We therefore reverse FERC's order reversing the Colorado agency determination.

REVERSED.