**WILLISTON BASIN INTERSTATE PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Arco Oil and Gas Company, Intervenor.**

No. 85–1835.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1986.
Decided April 24, 1987.

Robert T. Hall, III, Washington, D.C., for petitioner.

John Conway, Atty., F.E.R.C., with whom Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent. Jerome M. Feit, Sol., John N. Estes, III and Philip M. Marston, Attys., F.E.R.C., Washington, D.C., entered appearances for respondent.

Carroll L. Gilliam, with whom J. Paul Douglas, Washington, D.C., and Charles F. Hosmer, were on brief, for intervenor.

Carol A. Smoots and David J. Muchow, Arlington, Va., were on brief, for amicus curiae, The American Gas Ass'n, urging reversal.

Before BORK and D.H. GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge DOUGLAS GINSBURG.

DOUGLAS GINSBURG, Circuit Judge:

In Orders No. 338 [1] and 338–A,[2] the Federal Energy Regulatory Commission ("FERC" or the "Commission") designated four natural gas formations as "tight formations," thereby qualifying their output for higher, so-called "incentive" prices under section 107(c)(5) of the Natural Gas Policy Act of 1978 (NGPA).[3] ARCO Oil and Gas Co. (ARCO) owns the gas rights to these formations, and has contracted to sell the gas to Montana-Dakota Utilities Co. (MDU),[4] which under the sales contract, must pay an incentive price if the gas qualifies for such pricing. MDU opposed ARCO's application to FERC for "tight formation" designations, and now appeals the two orders, seeking their reversal.

MDU raises two principal grounds for reversal. First, MDU contends that it was arbitrary and capricious for FERC to rely on its own previous Order No. 99,[5] which established generic criteria for determining whether to grant "tight formation" designations in particular cases, despite evidence that the tight formation program was having unintended and undesirable consequences.[6] MDU renews the argument which FERC rejected in Order No. 338–A that the agency must abandon the use of

1. 48 Fed.Reg. 46,268; FERC Statutes and Regulations (CCH) ¶ 30,505 (1983).

2. 33 FERC (CCH) ¶ 61,175 (1985).

3. 15 U.S.C. § 3317(c)(5) (1982). The NGPA was enacted into law by Pub.L. 95–621, 92 Stat. 3351 (1978).

4. The contract was executed by MDU, which subsequently transferred its pipeline business to Williston Basin Interstate Pipeline Co., a wholly-owned subsidiary. In the opinion, we shall refer to both as MDU.

5. "Regulations Covering High-Cost Natural Gas Produced From Tight Formations." 45 Fed.Reg. 56,034; FERC Statutes and Regulations (CCH) ¶ 30,183 (1980). The genesis of Order No. 99 is described at length in *Pennzoil Co. v. FERC,* 671 F.2d 119, 123–25 (5th Cir.1982).

6. MDU here refers the court to three government reports: (1) General Accounting Office, *Problems Identified in FERC's Incentive Pricing Program for Natural Gas from Tight Formations* (Rept. No. GAO/RCED–85–49) (1985) (contrary to the supposition underlying the Conference Report on NGPA and Order No. 99, developing tight formations is not generally riskier or costlier than developing non-tight formations); (2) Department of Energy, *First Report Required by Section 123 of the Natural Gas Policy Act of 1978* (Rept. No. DOE/PE–0054) (1984) (incentive prices of tight formation gas above prices of substitute fuels, inducing producers prematurely to abandon lower-cost wells in favor of higher-cost but more profitable ones); and (3) Department of Energy, *Increasing Competition in the Natural Gas Market: The Second Report Required by Section 123 of the Natural Gas Policy Act of 1978* (Rept. No. DOE/PE–0069) (1985) (*accord*); as well as to (4) FERC's own proposed rulemaking, "Limitation on Incentive Prices for High-Cost Gas to Commodity Values," 48 Fed.Reg. 7469; FERC Proposed Regulations (CCH) ¶ 32,294 (1983).

In the proposed rulemaking, FERC disclosed that, contrary to expectation, in recent years lower demand for natural gas had coincided with higher prices, above the market-clearing level. This anomaly, in FERC's opinion, was "due both to the pricing mechanisms built into

the Order No. 99 generic criteria and make case-by-case determinations of when incentive prices are necessary, in keeping with its statutory duty to permit incentive pricing only when "necessary to provide reasonable incentives for ... production." [7] Second, MDU argues that even if FERC could properly rely on the criteria set out in Order No. 99, its conclusion that these four formations satisfied those criteria was arbitrary and capricious because FERC relied upon misleading data and used flawed methodologies in analyzing them.

We do not reach either of MDU's arguments, however, because we lack jurisdiction of MDU's petition to review FERC's orders, as explained below.

## I.

Responding to a 1977 presidential report indicating that regulation under the Natural Gas Act of 1938 [8] had resulted in underpricing, excess demand, and insufficient supplies of natural gas, Congress passed the NGPA in order to bring natural gas prices closer to the price of fuel substitutes. The NGPA provided for substantial deregulation of natural gas prices by 1985, after a transitional period intended to encourage production from new sources.

In order to encourage development of sources considered unprofitable at the existing price ceiling, the NGPA authorized sellers of certain types of gas to charge higher incentive prices; the eligible categories are "new natural gas," [9] "Outer Continental Shelf gas," [10] gas from a "new, onshore production well," [11] "stripper well natural gas," [12] and "high-cost natural gas." [13] The NGPA specifies the generic criteria defining each of these categories except for "high-cost natural gas," which is described as including gas from certain specified types of sources ("geopressured brine," "coal seams," and "Devonian shale"),[14] as well as gas "produced under such other conditions as the Commission determines to present extraordinary risks or costs." NGPA § 107(c)(5).[15] The Conference Report states that FERC might include within the high-cost gas category "natural gas produced from tight formations with little permeability, including Western tight sand formations...." [16] Since section 107(b) authorizes FERC to set a higher price only "to the extent that such special price is necessary to provide reasonable incentives for the production of such high-cost natural gas," [17] however, FERC may grant the "tight formation" designation only in situations where it is satisfied that the incentive price is needed in order to make high-cost gas worth exploiting. *See Pennzoil Co. v. FERC,* 671 F.2d 119, 123–125, 127 (5th Cir.1982).

---

the NGPA and the contracting practices of pipelines and producers" which "do not permit downward pricing flexibility." *Id.,* 48 Fed.Reg. at 7470. FERC therefore proposed to "cap" the Order No. 99 incentive price for wells drilled after the date of the proposal's publication. After comments were submitted, however, FERC terminated the rulemaking without adopting any new rule or otherwise amending Order No. 99. *See* Order No. 459, 51 Fed.Reg. 44,634; FERC Statutes and Regulations (CCH) ¶ 32,432 (1986). In so doing, FERC cited both a need for updated information and the recent promulgation of Order No. 451, which more broadly altered the pricing structure for natural gas in the hope of restoring prices to the market-clearing level. *See* Order No. 451, 51 Fed.Reg. 22,-168; FERC Statutes and Regulations (CCH) ¶ 30,701 (1986).

**7.** NGPA § 107(b), 15 U.S.C. § 3317(b).

**8.** 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. §§ 717–717w (1982)).

**9.** NGPA § 102(c), 15 U.S.C. § 3312(c).

**10.** NGPA § 102(d), 15 U.S.C. § 3312(d).

**11.** NGPA § 103(c), 15 U.S.C. § 3313(c).

**12.** NGPA § 108(b), 15 U.S.C. § 3318(b).

**13.** NGPA § 107(c), 15 U.S.C. § 3317(c).

**14.** NGPA § 107(c)(2)–(4), 15 U.S.C. § 3317(c)(2)–(4).

**15.** 15 U.S.C. § 3317(c)(5).

**16.** Joint Explanatory Statement of the Committee on Conference, Natural Gas Policy Act of 1978, H.R.Rep. No. 95–1752, 95th Cong., 2d Sess., 87 (1978). The Report is reprinted in [1978] U.S.Code Cong. & Ad.News 8800, 8983.

**17.** 15 U.S.C. § 3317(b).

Section 503 of the NGPA[18] outlines the procedures for determining whether specific gas falls within a given category of gas entitled to incentive pricing. It is specifically to be used for "applying the definition of high-cost natural gas under section 107(c),"[19] a responsibility that Congress divided between FERC and the state or federal "jurisdictional agency" that governs the drilling of wells on the particular site for which high-cost designation is requested. Unless the jurisdictional agency waives its role, in writing, it is to make the initial determination of whether specific gas satisfies the factual criteria for a particular category of incentive-priced gas.[20] As the Conference Report clearly states, the "determination made by such State or Federal agency includes the subsidiary determinations required to be made to determine the category for which natural gas production qualifies."[21]

FERC reviews the jurisdictional agency's factual determinations to ensure that they are supported by "substantial evidence."[22] Judicial review is subsequently available only if FERC reverses the jurisdictional agency's determinations; judicial review is not available if FERC upholds those determinations. *See Mesa Petroleum Co. v. FERC*, 688 F.2d 1014 (5th Cir.1982). This distinction is embodied in sections 503(b)(4)(B) and (c)(4) of the NGPA:[23] the latter provision states that jurisdictional agency determinations "shall not be subject to judicial review under any Federal or State law except as provided in subsection [503(b)]" which, at paragraph (4)(B), provides for judicial review only when FERC *reverses* a jurisdictional agency recommendation.[24] In such a case, the court is itself supposed to review the jurisdictional agency's determinations, not those of FERC, and is itself supposed to apply the substantial evidence test.[25]

18. 15 U.S.C. § 3413.

19. NGPA § 503(a)(1)(D), 15 U.S.C. § 3413(a)(1)(D). *See* NGPA § 107(c)(5), 15 U.S.C. § 3317(c)(5) ("For purposes of this section, the term 'high-cost natural gas' means natural gas determined in accordance with section 503 to be ... produced under such other conditions as the Commission determines to present extraordinary risks or costs.").

20. NGPA § 503(a)(1), (c)(1)–(2), 15 U.S.C. § 3413(a)(1), (c)(1)–(2).

21. The Conference Report goes on to state:

For example, in determinations regarding new natural gas [NGPA § 102(c), 15 U.S.C. § 3312(c) ], the agency determinations would include deciding whether a new well is outside the 2.5 mile distance from a marker well; or whether natural gas is behind-the-pipe or withheld, within the definitions specified in the appropriate sections, as may be further defined by the Commission.

H.R.Rep. No. 95–1752, at 117, U.S.Code Cong. & Admin.News 1978, p. 9034.

22. NGPA § 503(b)(1)(A), 15 U.S.C. § 3413(b)(1)(A). The Conference Report discusses at some length FERC's role in reviewing jurisdictional agency determinations:

The State or Federal agency determination must then be submitted to the Commission for review, accompanied by such substantiation as the Commission may require. The Commission may reverse the State or Federal agency classification if it finds that such de-

termination is not supported by substantial evidence. . . .

The conferees intend that the Commission's authority to review State or Federal agency determinations shall be limited to determining the narrow question of whether or not the agency determination is supported by substantial evidence. *The conferees have followed the traditional definition of substantial evidence review; that is, there is no intention to allow the Commission to "second guess"* the agency by independently weighing the evidence and reversing the agency's determination as if the initial responsibility to make the determination were placed within the Commission. If the Commission determines that substantial evidence exists for the State or Federal agency's determination, the Commission's inquiry and reviewing responsibilities terminate.

H.R.Rep. No. 95–1752, at 117–18, U.S.Code Cong. & Admin.News 1978, p. 9034.

23. 15 U.S.C. § 3413(b)(4)(B), (c)(4).

24. NGPA § 503(b)(4)(B), 15 U.S.C. § 3413(b)(4)(B). The Conference Report states that "[t]he Commission's action in *reversing* a State or Federal agency determination is subject to judicial review." H.R.Rep. No. 95–1752, at 118, U.S.Code Cong. & Admin.News 1978, p. 9035 (emphasis added).

25. NGPA § 503(b)(4)(B), 15 U.S.C. § 3413(b)(4)(B). The Conference Report states that:

The conferees intend that the question of whether the State or Federal agency determi-

The formations in the case before us were on federal lands, and the jurisdictional agency was the Bureau of Land Management (BLM) of the United States Department of the Interior. The BLM made the factual determinations necessary under Order No. 99 [26] and recommended that FERC grant the "tight formation" designations. Upon review, FERC found that those determinations were supported by substantial evidence.[27]

## II.

MDU concedes that if section 503 governs the grant of "tight formation" designations in this case, then no appeal lies because FERC upheld the jurisdictional agency's recommendation. Nonetheless, all the parties (including FERC) contend that judicial review is authorized here because, they reason, FERC did not act under section 503 at all in granting the "tight formation" designations in question.[28] They point out that in the rulemaking no-

tices surrounding Order No. 99 FERC stated that it would make these case-by-case "tight formation" determinations not through the procedures of section 503 but rather through somewhat different procedures of its own devising,[29] for which it claimed authority in its broad rulemaking powers under section 501 of the NGPA.[30] Indeed, FERC purports to rely on Section 503 only in making the secondary determination of whether particular wells on a previously designated tight formation are entitled to incentive pricing (the basic question being the date on which the well was drilled).[31] According to the parties, section 503 merely precludes judicial review of this well-specific determination when FERC agrees with the jurisdictional agency. They argue, though, that judicial review is available for FERC's granting of the initial "tight formation" designation, because section 506 of the NGPA [32] authorizes review of section 501 rulemakings. The parties argue that MDU therefore may seek re-

nation is supported by substantial evidence shall be a question of law. The Commission's determination of this question may be reversed by the court if it is not in accordance with the requirements of law; the Commission's determination to reverse a State or Federal agency determination must be based on a finding that there was no substantial evidence for such determination.
H.R.Rep. No. 95–1752, at 118, U.S.Code Cong. & Admin.News 1978, p. 9035. *See L & B Oil Co., Inc. v. FERC,* 665 F.2d 758, 762 (5th Cir.1982).

**26.** The substantive criteria of Order No. 99 are set forth in 18 C.F.R. § 271.703(c) (1986). There is no dispute that the factual determinations that must be made in order to determine whether a particular formation satisfies these criteria are the "subsidiary determinations" that, as Congress indicated in the Conference Report, are to be made by the jurisdictional agency.

**27.** *See* Orders No. 338 and 338–A, *supra* notes 1–2.

**28.** After this case was argued, the court *sua sponte* called for briefs on the issue of jurisdiction.

**29.** The procedure adopted by FERC, *see* 18 C.F.R. § 271.703, in many respects resembles section 503. In particular, Order No. 99 assigns primary fact-finding responsibility to the jurisdictional agencies, whose findings FERC reviews for substantial evidence.

**30.** 15 U.S.C. § 3411.

**31.** *See* 18 C.F.R. § 271.703(b)(2)–(3). In promulgating the "Interim Rule Covering High-Cost Natural Gas Produced From Tight Formations" that preceded Order No. 99, FERC stated that:
The Commission does not believe that its authority to engage in the formation identification process is limited to a section 503 review of jurisdictional agencies' determinations. Section 503 describes the Commission's review authority only with respect to well category determinations. Moreover, pursuant to section 501 of the NGPA, the Commission has the authority to engage in any activity and to issue any rules it finds necessary to carry out its functions under the NGPA. One of the Commission's functions under section 107 is to identify gas which is produced under extraordinary risk or cost. Given that function, and its authority under section 501, the Commission is not constrained by section 503 as [one] commentator suggested.
45 Fed.Reg. 13414, 13416; FERC (CCH) ¶ 30,130 (1980). FERC did not specifically discuss sections 501 and 503 in Order No. 99, *see* 45 Fed. Reg. 56034, 56035–36, 56042; FERC (CCH) ¶ 30,183, but in Order No. 99–A, FERC reaffirmed its stance, stating that "[t]he Commission has the discretion to qualify tight formations under either section 503 or by rulemaking." 45 Fed.Reg. 71563, 71563–64; FERC Statutes and Regulations (CCH) ¶ 30,183 (1980).

**32.** 15 U.S.C. § 3416.

view in this court of the "tight formation" designations in dispute here, notwithstanding the fact that FERC found the determinations of the jurisdictional agency (BLM) to be supported by substantial evidence.

### III.

As we have stated, it is undisputed that the NGPA precludes an aggrieved person from appealing the grant of a "high-cost natural gas" designation when, under section 503, FERC has affirmed the jurisdictional agency recommendation. Whether MDU may appeal the grant of the "tight formation" designations in this case therefore depends on whether FERC may avoid the statutory bar to judicial review by purporting to grant these designations through a section 501 rather than a section 503 rulemaking. We must therefore determine, under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), whether FERC's interpretation of its rulemaking powers under the NGPA, insofar as it would permit judicial review of the "tight formation" designations at issue, conflicts with Congress' "unambiguously expressed intent," and if not, whether that interpretation is a "permissible construction" of sections 501 and 503.

It is rare for Congress' intent to be as "unambiguously expressed" as it is in this case. The Conference Report indicates that the House and Senate originally disagreed on the procedural framework for determining what gas qualifies for incentive pricing:

The House passed bill required the Commission to delegate the authority to determine which production qualifies as new natural gas produced from a newly discovered reservoir to the appropriate State regulatory agency upon the request of that agency. The Commission was authorized to set terms and conditions for such a delegation, to rescind such delegation, and, within one year, to reverse or modify any determination made by the State agency.

·   ·   ·   ·   ·

The Senate passed bill assigned the Commission authority to determine what natural gas qualifies as new natural gas.[33]

In resolving the differences between the two bills, therefore, Congress squarely confronted the question of what procedures should be used. If Congress had wanted to authorize FERC to choose the procedures under which these "high-cost natural gas" designations would be made, it could have stated so expressly or it could have remained silent on the question, impliedly leaving it to be decided through FERC's rulemaking authority under section 501. Congress, however, exercised neither of these options.

Instead, Congress crafted a new section 503, an apparent compromise between the House's preference for the States and the Senate's preference for FERC to determine what gas would qualify for incentive pricing. Moreover, Congress specifically stated in subsection (a)(1) that the procedures of section 503 apply to the granting of the incentive-price designations, including "high-cost natural gas" designations. Indeed, in sections 102(c)(1)(A)–(B), 103(a), 107(c), and 108(b),[34] Congress *defined* the various categories of incentive-priced gas as that "natural gas determined in accordance with section 503" to satisfy the statutory or regulatory criteria.[35]

The parties' contention that FERC may avoid the specific procedures of section 503 by relying instead on its general rulemaking authority under section 501 renders section 503 nothing more than a mere suggestion from Congress for FERC to take or

**33.** H.R.Rep. No. 95–1752, at 116–17, U.S.Code Cong. & Admin.News 1978, p. 9033.

**34.** 15 U.S.C. §§ 3312(c)(1)(A)–(B), 3313(a), 3317(c), and 3318(b).

**35.** *See* H.R.Rep. No. 95–1752, at 117, U.S.Code Cong. & Admin.News 1978, p. 9033 ("The State

or Federal agency with natural gas under its regulatory jurisdiction determines whether certain natural gas satisfies the required factual determinations to be classified as ... high-cost natural gas under sec. 107 ...").

not as it likes. We cannot ascribe to Congress, which had explicitly rejected alternative procedures in favor of the detailed and extensive procedure in the statute, the intention of simply providing FERC with a possible approach to granting NGPA designations. Congress clearly intended that these designations would be made through the procedural scheme it enacted for that specific purpose, and section 503 was that scheme. FERC therefore may not avoid section 503's rules governing judicial review by relying on its section 501 rulemaking authority.[36]

## IV.

We therefore hold that, as Congress stated in section 503(c)(4), judicial review of "tight formation" designations is available only as provided in section 503(b). In this case, the BLM determined that the ARCO formations satisfied the "tight formation" criteria set forth in Order No. 99, and FERC found that the BLM's factual determinations were supported by substantial evidence. Under section 503(b)(4), no further review is available. We cannot be a party to any attempt, by the manipulation of mere form, to make reviewable that which, in substance, Congress has made unreviewable.

Because we lack jurisdiction over it, the petition is

*Dismissed.*

---

**36.** We do not need to determine whether the procedure that FERC actually substituted for the statutory procedure is in any way defective except insofar as it purports to culminate in an order reviewable in court.