**UNION TEXAS PRODUCTS CORPORATION and Union Texas Petroleum Corporation, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 88–4881.

United States Court of Appeals, Fifth Circuit.

May 1, 1990.

Teresa Paulissen–Steer, Union Texas Petroleum Corp., Houston, Tex., J. Paul Douglas, Peter G. Hirst, Washington, D.C., George J. Domas, Deborah Bahn Price, Liskow & Lewis, New Orleans, La., and Grove, Jaskiewicz, Gilliam, Washington, D.C., for petitioners.

---

Jerome Feit, Frank R. Lindh, and Samuel Soopper, Solicitors, F.E.R.C., Washington, D.C., for respondent.

Before CLARK, Chief Judge, and BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Senior Circuit Judge:

Union Texas Products Corporation and Union Texas Petroleum Corporation (Union Texas) seek judicial review of orders issued by the Federal Energy Regulatory Commission (FERC or Commission). The Commission had ordered Union Texas to refund $1.8 million dollars collected as an inflation adjustment to the statutorily prescribed base rate, because Union Texas inadvertently neglected to file a one-page form specifying which of its wells qualified as "stripper wells" under § 108 of the Natural Gas Policy Act (NGPA). Because Union Texas satisfied all four of the criteria we set out in *Superior Oil v. FERC*, 667 F.2d 1180 (5th Cir.1982), we vacate the Commission's orders and remand the case with instructions.

*Regulatory Background*

This case concerns the pricing of natural gas which qualifies for the incentive price provided by Congress under § 108 NGPA, 15 U.S.C. § 3318, for "stripper well" gas—i.e., gas produced from wells with certain relatively low rates of production as defined in the statute.[1] The stripper well price, like other "maximum lawful prices" under the NGPA, consists of a statutorily prescribed rate plus a monthly inflation adjustment. The right of the seller to collect the § 108 price depends principally on: (i) whether the gas is produced from a qualified well, a determination made by an appropriate state or other jurisdictional agency, subject to review by the Commission;[2] and (ii) whether the seller's contract with the purchaser permits it to collect the § 108 price, a determination made by the Commission in response to a rate increase application filed by the seller in accordance with § 4 of the Natural Gas Act (NGA) 15 U.S.C. § 717c and the Commission's regulations thereunder.

The controversy in this case centers on the latter question—specifically on the consequences of the seller's admittedly inadvertent failure to file a § 4 rate increase application. Section 4(d) of the NGA, 15 U.S.C. § 717c(d), requires producers[3] to give advance notice of proposed changes in rates for sales subject to the Commission's jurisdiction under the NGA. The underlying purpose of § 4 of the NGA is (i) to give advance notice of proposed rate changes and (ii) to allow the Commission to determine that the proposed rates were "just and reasonable" and authorized by the appropriate rate schedules. Until November 17, 1978, the Commission's implementing regulations provided that any time an increase or decrease in rates was proposed, the producer had to submit a notice of rate change on a Schedule 507 of Form 108, which was the predecessor of Format No. FERC 559.[4]

---

1. Section 108(b) of the NGPA defines "stripper well natural gas" as gas produced at an average rate of 60 Mcf (thousand cubic feet) or less per production day over a 90–day period, from a well producing "at its maximum efficient rate of flow * * *." It also authorizes the Commission to provide by rule for continued "stripper well" eligibility in the case of wells that produce more than 60 Mcf/day through the use of enhanced recovery techniques.

2. *See* NGPA § 503, 15 U.S.C. § 3413; *see generally Williston Basin Interstate Pipeline Co. v. FERC*, 816 F.2d 777, 780 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988); *L & B Oil Co., Inc. v. FERC*, 665 F.2d 758, 760 (5th Cir.1982).

3. With respect to some 80% of the approximately 230 wells involved, Union Texas was not the producer of the gas; but, rather, it purchased the gas from non-affiliated producers. Nevertheless, even to the extent that Union Texas was the purchaser, not producer, of the gas, Union Texas was required by the Commission's regulations to comply with § 4 of the NGA and the Commission's regulations thereunder, as it purchased gas for processing under percentage of proceeds contracts. 18 C.F.R. § 154.91(e).

4. "Format FERC No. 559," *codified at* 18 C.F.R. § 250.14 (1988). *See* Order No. 196, 46 Fed. Reg. 60429 (1981) (*reproduced at* 1981–1985 FERC Stats. & Regs. (CCH), Regs. Preambles

The procedure envisioned by § 4 of the NGA became both unnecessary and unworkable following the passage of the NGPA for several reasons. First, in the NGPA, Congress, rather than the Commission, established the maximum lawful price for which gas could be sold and determined, by statute, that those maximum lawful prices were "just and reasonable." If a producer met the various qualification requirements and followed the procedures prescribed under § 503 of the NGPA, 15 U.S.C. § 3413, the § 108 price was deemed "just and reasonable." The Commission's reduced responsibilities with regard to the setting of "just and reasonable" rates was made evident by the replacement of Schedule 507 of Form 108 with the much simpler one-page Format No. FERC 559, which Union Texas failed to file in this case.[5]

Second, Congress directed the Commission to establish interim collection procedures to permit the producer to collect the various maximum lawful prices pending completion of the qualification procedures required by the NGPA. NGPA § 503(e), 15 U.S.C. § 3413(e). The Commission promulgated regulations implementing this statutory requirement, pursuant to which a producer was allowed to collect the § 108 price on an interim basis by filing a notice of intent to make interim collections with the Commission and with the purchaser. 18 C.F.R. §§ 273.201–273.204. This was deemed 'to satisfy the notice requirements of § 4 of the NGA.

Finally, in the NGPA, Congress provided that monthly inflation adjustments could be collected with respect to the maximum lawful prices that it deemed to be just and reasonable. These monthly increases, however, are not self-implementing in the case of gas—like § 108 gas—that remains subject to Commission jurisdiction under the NGA. Rather, as the Commission explained in a rulemaking order issued short-

ly after the enactment of the NGPA, "[a]bsent amendments to the Commission's regulations [governing producer rate filings], a producer would be required to file a change in rate each month in order to charge and collect the additional increment in the maximum lawful price reflecting the inflation adjustment." Order No. 15, 45 Fed.Reg. 55756 (1978), *reproduced at* 1977–1981 FERC Stats. & Regs. (CCH), Regs. Preambles ¶ 30,022, at p. 30,107.

Because the Commission found that strict compliance with such procedures would have required an estimated 200,000 rate filings per year (Order No. 15, *supra,* Regs.Preambles at p. 30,108), it devised a "blanket affidavit" procedure. Under this procedure, a producer is allowed to collect NGPA monthly inflation adjustments by filing a single affidavit indicating its intent to collect continuously month by month the maximum lawful price for every sale listed in the affidavit. 18 C.F.R. § 154.94(h). This procedure, however, is available only to producers who are "entitled on the basis of having qualified under the [NGA] filing requirements for a base rate." § 154.94(h)(1); *see also* § 154.94(h)(3) (sales covered by affidavit limited to those for which a base rate is established). The "base rate" is the applicable maximum lawful price, e.g., the § 108 price. Thus, once the well determination becomes final, the producer's "interim" authority to collect the NGPA price expires, and the producer must file to establish the applicable NGPA incentive price as the "base rate" in order to continue to charge that price.

### Union Texas' Blanket Affidavit Filings

On December 28, 1978, Union Texas filed a blanket affidavit for the purpose of collecting inflation adjustments under NGPA §§ 104 and 106. The list attached to the affidavit (termed "Exhibit A") contained all

---

¶ 30,320) (promulgating the Format FERC No. 559).

**5.** *Discontinuance of Certain Producer reports and Related Forms Nos. 108 and 314–B, and Reissuance and Revision of Producer Filing Instructions,* 46 Fed.Reg. 14899 (Mar. 3, 1981) (Notice of Proposed Rulemaking), reprinted in

1977–1981 Proposed Regs., FERC Stats. and Regs. ¶ 32,115 at 33,020 (noting that the Form No. 108 data bank was obsolete after the enactment of the NGPA); *id.* at 33,021 (noting that the new Format No. FERC 559 resulted in a 30 percent net reduction the data elements required).

of the required information for each of Union Texas' rate schedules, including the five rate schedules at issue here.[6] A column labeled "Applicable NGPA Rate" showed various § 104 and 106 prices for each of Union Texas' 75 rate schedules.

On June 16, 1980, after the blanket affidavit regulations were revised to permit the inclusion of § 108 gas, Union Texas filed an amended blanket affidavit, indicating its intent to collect also the § 108 price for eligible sales under these rate schedules. However, Union Texas did not include an amended "Exhibit A" but merely incorporated by reference the original "Exhibit A." Thus, the amended blanket affidavit in effect indicated only a general intent to collect the § 108 price without specifically indicating which of Union Texas' various rate schedules would be affected.

Under the regulations described above, Union Texas was then obligated to file a § 4 rate increase application and further amend the blanket affidavit once the first § 108 well determination became final for each of the rate schedules under which it intended to collect the § 108 price. However, because of an inadvertent clerical error, Union Texas failed to file a rate change notice on Format FERC No. 556 when the first § 108 determination for a well covered by each of the rate schedules became final.

### The Commission's Orders

Not until 1986, six years after the filing of Union Texas' 1980 blanket affidavit, did the Commission staff begin processing Union Texas' blanket affidavit filings. At this time the Commission discovered that Union Texas had neglected to file a notice of rate change when the first well covered by each of its five rate schedules received a final § 108 determination. Immediately after being advised by the Commission to file a Format No. FERC 559 for each of the five rate schedules, Union Texas submitted the missing forms.

The Director of the Commission's Office of Pipeline and Producer Regulation (OPPR) by Letter Order accepted Union Texas' October 1986 rate filings but made them effective from that date forward. Thus the Director indicated that Union Texas was entitled to only the § 108 price in effect under each rate schedule at the time the company's interim collection authority lapsed. As to the inflation adjustment, however, he ruled that was to be prospective only from the date of the required rate increase application. Accordingly, the Director ordered that any excess amounts should be refunded by Union Texas to its customers. The total amount to be refunded exceeds $1.8 million dollars.

Union Texas appealed the Letter Order of the Director, arguing that they should not be precluded from collecting the monthly inflation adjustments after the effective dates of the final well determinations, even though they inadvertently neglected to file a notice of rate change, because all of the required information was already on file with the Commission. Union Texas also argued that the refunds required by the letter order would be grossly out of proportion to the omission of this one-page form from Union Texas' filings, citing *Superior Oil Co. v. FERC*, *supra*. Finally, because of the equitable considerations involved, Union Texas requested that the Commission waive its filing requirements for the missing form.

In its Order Denying Appeal, the Commission upheld the Director, ruling that Union Texas' blanket affidavit and well determination filings could not be treated as the equivalent of a § 4 rate filing under the plain meaning of the regulations. 44 FERC at pp. 61,860–61,861. The Commission stated:

> Under Section 154.94(b) and (f) and 251.-14 of the regulations the basic information concerning a proposed increase is to be filed in one format in one place within

6. The five rate schedules at issue here involve sales by Union Texas to Lone Star Gas Company, El Paso Natural Gas Company, and Panhandle Eastern Pipeline Company from four processing plants operated by Union Texas in Texas

and Oklahoma. Union Texas has estimated that, of a total of some 3,000 wells covered by the five rate schedules, approximately 230 are qualified as "stripper" wells under § 108.

a specified time period relative to the proposed increase so that the Commission, the purchaser, and the public may be apprised thereof. Any party, including members of the public, desiring to know whether a rate is proposed to be increased in a situation such as this, should not be required to do more than examine the pertinent rate schedule for a notice, containing appropriate reference to a blanket affidavit, if one is to be applicable, filed in accordance with the regulations.

*Id.* And, on this point, the Commission concluded that Union Texas' filings "were inadequate, singly or collectively to constitute a rate increase filing within the meaning" of the Commission regulations. *Id.*

The Commission further concluded that Union Texas was not entitled to a waiver of the § 4 filing requirements on equitable grounds, since the company offered no reason other than inadvertence for its omission. 44 FERC at p. 61,861—61,862. The Commission emphasized in this regard that Order No. 362 had already alleviated to a significant extent the financial consequences to companies in Union Texas' position.[7]

The Commission thereafter denied Union Texas' request for a rehearing, which was limited to two arguments in support of its position.[8] First, the company argued that the case should be governed by this Court's decision in *Superior,* which reversed a Commission order denying a particular effective date for a rate filing that was technically incomplete on that date. The Commission, however, found the *Superior* case to be distinguishable, stating that "this case is one of no rate filing, rather than, like *Superior,* one of an imperfect rate filing." Second, the company continued to urge the Commission to waive the § 4 filing requirement on equitable grounds. The Commission again declined to do so, "find[ing] no merit in the request because it in effect makes a nullity of Order No. 362."

### Just as Superior?

In *Superior,* the oil company (Superior) inadvertently neglected to file a notice of rate change[9] with the Commission, and the issue before the court was whether the proposed rate increase should be effective as of the date the missing form was received or whether it should have been made effective retroactively to the date the original schedules and blanket affidavits were filed.[10] In vacating the Commission's deci-

---

7. Order No. 362, issued by the Commission on February 22, 1984, made two significant changes to the blanket affidavit regulations. First, the Commission extended the deadline for making § 4 "base rate" filings, from 30 days after a final well determination to 90 days after such determination. Second, the rules were amended to ameliorate the effect of a failure to make such a rate filing: Instead of reverting back to the pre-NGPA price, the producer who fails to make such a filing is now permitted to continue collecting the incentive price (e.g., the § 108 price) that the producer had been collecting on an interim basis; the only penalty is that the producer is not entitled to any monthly inflation adjustments after the date of the final well determination. *See* Proposed Regulations ¶ 32,343 at pp. 32,755—32,756 (discussing the fact that under the old rules the producer would revert back to the pre-NGPA price) and pp. 32,757—32,758 (proposing to amend the rules to permit the seller to collect the § 108 price, but not inflation adjustments); Order No. 362, Regs. Preambles at p. 30,887 (adopting the proposed change in final form). The latter provision is codified at 18 CFR § 154.94(h)(2)(ii).

8. This opinion is limited to a discussion of whether or not Union Texas met the criteria set down in *Superior, supra.* Since our resolution of this issue is decisive, we do not reach the alternative grounds for reversing the Commission's decision, i.e., (i) that Union Texas substantially complied with the Commission's filing requirements; or (ii) that the Commission should have granted an equitable waiver of the advance notice requirement under § 4 of the NGA, 15 U.S.C. § 717c.

9. The notice of rate change form which Superior failed to file was known as a "Schedule 507." Schedule 507 was the predecessor of the Format FERC No. 559, which Union Texas failed to file in the case *sub judice.*

10. Because Superior was seeking authorization to collect the maximum lawful price under "rollover" contracts, it was required to file the contracts and certain other schedules in addition to the blanket affidavits and rate change notices. By comparison, Union Texas' contracts were already on file with the Commission, and the only additional filings that were required were (i) a blanket affidavit and (ii) a notice of

sion to impose a $1.4 million dollar forfeiture on the oil company in *Superior* for what it called an "inconsequential clerical error," we stated:

> However, the Commission's punctilious insistence that the failure to follow its directions in the minor respect here involved should result in such a disproportionately heavy penalty works a manifest injustice and constitutes an abuse of discretion.

*Superior,* at 1182. Although we cautiously emphasized in Superior that "we do not intend to open up a Pandora's box, nor, for that matter, do we intend to give the slightest indication that the Commission's rules for filing do not have to be complied," we overturned the Commission's order because of the following four criteria: (i) the error was technical and limited to a clerical mistake, (ii) the information needed appeared elsewhere in the filing, (iii) the Commission made no unanswered request for a proper form, and (iv) a contrary result would work such an exorbitant forfeiture as to constitute a manifest injustice. *Id.;* see also, *Atlantic Seaboard Corp. v. FPC,* 201 F.2d 568, 571–72 (4th Cir.1953).

The Commission attempts to distinguish *Superior* from this case by arguing that Union Texas made *no* rate filing, while

Superior simply made an *incomplete* rate filing. However, we spurned such semantic distinctions in *Superior,* when the Commission tried to distinguish Superior's filing from the filing in the case *Superior* relied upon, *Atlantic Seaboard Corp., supra.*[11] In any case, the standard we established in *Superior* makes no mention of "incomplete" or "absent" filings; we merely established as one of the criteria that "the information needed appeared elsewhere in the filing." *Id.*

Without doubt, Union Texas satisfied three ((i), (iii) and (iv)) of the four *Superior* criteria, above. We must determine whether criteria (ii) was proved, i.e., whether the information contained in Format No. FERC 559 appeared elsewhere in the Commission's records. Union Texas asserts that the information was available to the Commission in the following ways: (i) the Commission itself approved the NGPA § 108 well determinations for the stripper wells at issue[12]; (ii) when the Commission again amended its regulations in 1983 to provide for the filing of a blanket affidavit to authorize the collection of allowances for production-related costs as permitted by § 110 of the NGPA, 15 U.S.C. § 3320, Union Texas filed another blanket affidavit, dated May 4, 1983; and the list of rate schedules

rate change once the first well under each of its rate schedules received a final determination.

**11.** The relevant passage from *Superior* states:
The Commission would distinguish *Atlantic Seaboard* on the basis that there the court was dealing with a "mere amendment" to a filing whereas here what is involved is an "incomplete" filing. This distinction is semantic at best. Clearly the instant case and *Atlantic Seaboard* both involve rate filings which were deficient in formal particulars, and subsequent action by the company to correct the mistake. The question in both cases is whether the effective date of the proposed rates shall be the date that the original materials were filed or the date that the data was put into the form required.
*Superior,* at 1182.

**12.** *See* 18 CFR §§ 274.101, 274.103, 274.201 and 274.206. As part of the application procedure for stripper well qualification, the producer must include a statement that it has delivered or mailed a copy of a completed FERC Form 121

to the purchaser of the gas. 18 CFR § 274.201(d). This form alerts the purchaser to the fact that an application for a determination has been filed. Within 15 days after the jurisdictional agency makes a determination, it must give notice of its determination to the Commission. 18 CFR § 274.104(a). The Commission then sends an acknowledgment of receipt of the notice to the producer and posts that acknowledgment in the Commission's Division of Public Information. 18 CFR § 275.201. No acknowledgment is sent to the purchaser. The determination becomes final unless, within 45 days after the Commission's determination, either the Commission takes some action or the application is withdrawn. 15 U.S.C. §§ 3413(b)(1) and (2). Purchasers have the right to protest if the prices sought are not authorized by contract. 18 CFR §§ 275.203 and 275.204. In the vast majority of cases, no protests are filed and the determination becomes final after the expiration of the 45–day waiting period. No notice of the expiration of this period, however, is given to anyone, including the seller and the purchaser of the gas.

attached to this blanket affidavit clearly showed that Union Texas intended to collect the § 110 allowances for gas qualified under § 108 and sold under the rate schedules at issue in this appeal [13]; and (iii) even though the amended blanket affidavit did not identify the particular rate schedules that would be affected once the well determinations became final, the Commission was well aware of the rate schedules that would be affected because Union Texas was already collecting the § 108 price, as well as the applicable monthly escalations, pursuant to interim collection notices.[14]

Because all of the missing information was on file with the Commission, albeit not on a single one-page form as the regulations technically require, and because the other criteria of *Superior* were clearly satisfied, we hold that the Commission abused its discretion in imposing the $1.8 million dollar penalty on Union Texas for failing to file a Format FERC No. 557. The order of the Commission sought to be reversed is therefore VACATED and the proceeding REMANDED with directions to enter December 28, 1978 as the effective date of Union Texas' rate filings.

VACATED and REMANDED.

---

**13.** Of course, this reason standing alone only justifies a finding of notification from May 4, 1983 forward.

**14.** Section 503(e) of the NGPA, 15 U.S.C. § 3413(e), permits a producer to collect NGPA incentive prices, including the § 108 incentive price for stripper well gas, during the period when a well determination is pending. A producer obtains such interim authority by filing a one-time notice of intent with the Commission. This interim authority expires when the well determination becomes final, or after one year, whichever occurs first. *See* 18 CFR § 273.202.